117 N.J. Super. 155 (1971)
283 A.2d 911
RALPH C. PETERSEN, DOROTHY C. PETERSEN, LOUISE E. GIBBONS, EDGAR H. GIBBONS, RUSSELL J. PEDERSON, BONNIE M. PEDERSON, HARRY H. CHAPMAN, JR., NANCY A. CHAPMAN, JOSEPH T. GOLDEN, DIANE B. GOLDEN, WILLIAM B. SINCLAIR, MARIE A. SINCLAIR, JOSEPH G. CHAFFEE, BARBARA H. CHAFFEE, VINCENT G. BRZEZINSKI, GEORGINE BRZEZINSKI, SILVIO GALTERIO, MARIE GALTERIO, YOLANDA GIANNELLA, J. EDWIN CAREY AND MARION G. CAREY, PLAINTIFFS,
v.
BEEKMERE, INCORPORATED, A NONPROFIT CORPORATION OF THE STATE OF NEW JERSEY, GLENDALE INVESTMENTS CORP., A CORPORATION OF THE STATE OF NEW JERSEY, CHESTER J. DECKER AND ELIZABETH J. DECKER, DEFENDANTS. BEEKMERE, INC., ETC., ET ALS., PLAINTIFFS,
v.
RALPH C. PETERSEN ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided November 19, 1971.
*157 Mr. Samuel M. Lyon, Jr., attorney for plaintiffs.
Messrs. Hirschklau and Wasserman, attorneys for Beekmere, Inc. (Mr. Morton Hirschklau appearing).
*158 Mr. Peter Calcia, attorney for defendants Glendale Investments Corp. and Chester J. Decker and Elizabeth J. Decker.
LORA, J.S.C.
This is a class action to construe a covenant compelling purchasers of property in a subdivision, known as Allison Acres, to purchase a share of stock in a community association, Beekmere, Inc. Said action has been consolidated with a county district court suit instituted by Beekmere against each of the plaintiffs herein for $100 for a required stock subscription, and for $75 representing the 1969 annual assessment as against each of them.
The pertinent facts reveal that the original tract surrounding a small lake was owned by Glendale Investments Corp., which subdivided said tract into five sections, the fifth and final subdivision being filed March 18, 1968. The principal stockholders of Glendale, Charles and Elizabeth Decker, formed Beekmere, Inc., a corporation for profit under Title 14 of the Revised Statutes (now N.J.S.A. 14A), said corporation's ostensible purpose, as gleaned from its certificate of incorporation, being the development of land for recreational pursuits, the sale of merchandise incidental thereto, the operation of a private club for the limited membership of lot owners in various real estate developments, and to deal in lands generally.
On January 31, 1961 Glendale conveyed to Beekmere the lake and a certain access lot to the lake in Section Two of the subdivision. A set of covenants, one of which is at issue herein, was not annexed to the deed. On June 29, 1962 Beekmere conveyed back to Glendale; no restrictions were involved. Thereafter, on October 16, 1967 Glendale reconveyed to Beekmere the lake and access lot together with an easement retained by the grantor over two lots with access to the lake in Section Five of the subdivision; no covenants were annexed to the deed.
Individual lots were conveyed by Glendale to purchasers who were predecessors in title of the within plaintiffs, and *159 a copy of the covenants were annexed to all deeds in these original conveyances. In subsequent conveyances by these individual lot owners to plaintiffs, the covenants were not annexed to some of the deeds. The covenant in dispute, set forth in a document annexed to such deeds and entitled "Covenants for Insertion in Deeds `Allison Acres,' Sections * * *," recited:
Whereas, the Purchaser (hereinafter designated as the Owner), agrees to apply for membership in Beekmere, Incorporated (hereinafter designated as Beekmere), and member to purchase one share of the common stock of said Beekmere, for a sum not in excess of $100.00 and to comply with and conform to the Constitution and By-Laws of said Beekmere * * *.
The threshold question for the court is whether this covenant, being affirmative in nature, can be enforced at law through the medium of the county district court action, or in equity, by plaintiffs' action to construe the covenant. Plaintiffs argue that under the law of this State affirmative covenants cannot be enforced, relying on Furness v. Sinquett, 60 N.J. Super. 410 (Ch. Div. 1960), which involved an action against subsequent grantees for the enforcement by mandatory injunction of a covenant to construct sidewalks in front of their homes and to remove certain obstructions in street areas.
It appears from the opinion that each original conveyance from the common developer contained the covenant. Testimony was adduced that partically all the lots upon which residences were constructed were made subject to the covenant, the respective parties involved having obtained possession by mesne conveyances, and defendants did not deny that a similar covenant was contained in their chain of title. The court noted that plaintiff had proved a "neighborhood scheme" by showing that the grantor had inserted in each deed, like restrictions concerning the use of the lands from the original owner, but stated that the fact that such a "neighborhood scheme" had been shown did not alter the *160 fact that the covenant sought to be enforced was affirmative rather than negative in nature.
The court in Furness stated that beginning with the English case of Spencer's Case, 1 Smith's Lead. Cas. 145, 5 Coke 16a, and followed in New Jersey by Brewer v. Marshall and Cheeseman, 19 N.J. Eq. 537, 546 (E. & A. 1868), our courts have refused enforcement of affirmative covenants, quoting dictum from De Gray v. Monmouth Beach Club House Co., 50 N.J. Eq. 329, 332-333 (Ch. 1892), aff'd p.c., 67 N.J. Eq. 731 (E. & A. 1894):
It is settled that a court of equity will restrain the violation of a covenant, entered into by a grantee, restrictive of the use of lands conveyed, not only against the covenantor, but against all subsequent purchasers of the lands with notice of the covenant, irrespective of the questions whether the covenant is of a nature to run with the land, or whether it creates an easement; provided, however, that its enforcement is not against public policy. [Citations omitted] * * *
This rule of equity being an encroachment on the general doctrine of the common law, that the burden of a covenant does not run with the land [citations omitted], its application is not to be extended beyond the class of cases in which it has been heretofore enforced [citation omitted], and is to be confined to negative covenants.
However, whether affirmative covenants are enforceable at law or in equity does not appear to be settled in this State. The De Gray case, upon which the court relied in Furness v. Sinquett, supra, involved a negative rather than an affirmative covenant, and thus the Court of Errors and Appeals did not pass on the question. Javna v. D.J. Fredericks, Inc., 41 N.J. Super. 353, 360 (App. Div. 1956), noted but likewise did not rule thereon. In addition to De Gray v. Monmouth Beach Club House Co., supra, the cases of Brewer v. Marshall and Cheeseman, 18 N.J. Eq. 337 (Ch. 1867), aff'd 19 N.J. Eq. 537 (E. & A. 1868), and Costigan v. Pennsylvania R.R. Co., 54 N.J.L. 233, 242 (Sup. Ct. 1892), contained some very early statements that the burdens of covenants, affirmative or otherwise, do not run at law except as between landlord and tenant.
*161 The court in Conover v. Smith, 17 N.J. Eq. 51, 55 (Ch. 1864), while it did not have the question of affirmative covenants directly before it, stated by way of dictum that if a lessee covenanted for himself and his assigns to make a new wall upon the demised premises, the assignee was bound; and Child v. C.H. Winans Co., 119 N.J. Eq. 556 (E. & A. 1936), which involved a covenant by the grantee to pay taxes and assessments on land retained by the grantor, although held not to be a covenant running with the land, allowed enforcement against a subsequent purchaser under a theory of an equitable lien.
A view of other jurisdictions indicates that the weight of authority permits the enforcement of affirmative covenants, although courts have not distinguished between the rubrics under which such enforcement is effected, whether it be by covenant running with the land at law, or as an equitable servitude enforceable against a subsequent purchaser with notice. Adaman Mutual Water Co. v. United States, 278 F.2d 842 (9 Cir.1960); Note, "Affirmative Duties Running with the Land," 35 N.Y.U.L. Rev. 1344 (1960), and appendix at 1365-1369; 7 Thompson, Real Property § 3153 at 78 (1962); 2 American Law of Property (Casner ed. 1952), § 9.36, at 438-439; 20 Am. Jur.2d Covenants, Conditions and Restrictions, § 37 at 607, where it was stated that courts make no distinction between affirmative and negative covenants regarding their running with the land, the chief consideration in running being whether the covenant relates to the land so as to enhance its value and confer benefit, rather than whether it is affirmative or negative in nature. See also, Annotation, "Affirmative Covenants as Running with the Land," 68 A.L.R.2d 1022, § 4 at 1026 (1959), and cases in earlier annotations at 41 A.L.R. 1363 (1926), 51 A.L.R. 1326 (1927), 102 A.L.R. 781 (1936) and 118 A.L.R. 982 (1939).
In New York the courts adhered to the old English rule that affirmative covenants did not run with the land so as to charge the burden of performance upon a subsequent *162 grantee. Miller v. Clary, 210 N.Y. 127, 103 N.E. 1114 (Ct. App. 1913). However, such position has been eroded in that state due to recognized exceptions, and in subsequent cases that in all but letter appear to overrule Miller v. Clary. In accord with the view that New York has thus changed its position, see 7 Thompson, Real Property, § 3153 at 78, note 7 (1962); 2 American Law of Property (Casner ed. 1952), § 9.36 at 438; 20 Am. Jur.2d Covenants, Conditions and Restrictions, § 37, p. 607, 5 Powell, Real Property, § 677 at 195 (1970). Cf. Tarantelli v. Tripp Lake Estates, Inc., 63 Misc.2d 913, 314 N.Y.S.2d 21 (Sup. Ct. 1970), for an apparent statement that an affirmative covenant will not run. In Nicholson v. 300 Broadway Realty Corp., 7 N.Y.2d 240, 196 N.Y.S.2d 945, 949-950, 164 N.E.2d 832, 835 (1959), which involved a covenant to furnish heat, the Appellate Division stated:
The burden of affirmative covenants may be enforced against subsequent holders of the originally burdened land whenever it appears that (1) the original covenantor and covenantee intended such a result; (2) there has been a continuous succession of conveyances between the original covenantor and the party now sought to be burdened; and (3) the covenant touches or concerns the land to a substantial degree.
The Appellate Division relied on a case very similar on its facts to the present one: Neponsit Property Owners' Ass'n v. Emigrant Industrial Sav. Bank, 278 N.Y. 248, 15 N.E.2d 793 (Ct. App. 1938). In that case an action was brought by an association of property owners, as assignee of the original covenantee, to foreclose a lien upon defendant's land, the lien arising from a covenant contained in a deed from the original owner-developer to defendant's predecessor in title. The covenant required payment of an annual charge to be devoted to maintenance purposes of roads, parks, beach and such. Noting that this was an affirmative covenant to pay money for use in connection with, but not upon, the land, the court in a well reasoned opinion stated:
*163 It has been often said that a covenant to pay a sum of money is a personal affirmative covenant which usually does not concern or touch the land. Such statements are based upon English decisions which hold in effect that only covenants, which compel the covenanter to submit to some restriction on the use of his property, touch or concern the land, and that the burden of a covenant which requires the covenanter to do an affirmative act, even on his own land, for the benefit of the owner of a `dominant' estate, does not run with his land. * * * [t]here were some exceptions or limitations in the application of the general rule. Some promises to pay money have been enforced, as covenants running with the land, against subsequent holders of the land who took with notice of the covenant. [Citations omitted.] It may be difficult to classify these exceptions or to formulate a test of whether a particular covenant to pay money or to perform some other act falls within the general rule that ordinarily an affirmative covenant is a personal and not a real covenant, or falls outside the limitations placed upon the general rule. At least it must `touch' or `concern' the land in a substantial degree, and though it may be inexpedient and perhaps impossible to formulate a rigid test or definition which will be entirely satisfactory or which can be applied mechanically in all cases, we should at least be able to state the problem and find a reasonable method of approach to it. It has been suggested that a covenant which runs with the land must affect the legal relations  the advantages and the burdens  of the parties to the covenant, as owners of particular parcels of land and not merely as members of the community in general, such as taxpayers or owners of other land. [Citations omitted]. That method of approach has the merit of realism. The test is based on the effect of the covenant rather than on technical distinctions. Does the covenant impose, on the one hand, a burden upon an interest in land, which on the other hand increases the value of a different interest in the same or related land?
Even though we accept that approach and test, it still remains true that whether a particular covenant is sufficiently connected with the use of land to run with the land, must be in many cases a question of degree. A promise to pay for something to be done in connection with the promisor's land does not differ essentially from a promise by the promisor to do the thing himself, and both promises constitute, in a substantial sense, a restriction upon the owner's right to use the land, and a burden upon the legal interest of the owner. On the other hand, a covenant to perform or pay for the performance of an affirmative act disconnected with the use of the land cannot ordinarily touch or concern the land in any substantial degree. Thus, unless we exalt technical form over substance, the distinction between covenants which run with land and covenants which are personal, much depend upon the effect of the covenant on the legal rights which otherwise would flow from ownership of land and which are connected with the land. The problem then is: Does the covenant in purpose and effect substantially alter these rights? [278 N.Y. at 256-258; 15 N.E.2d at 795-796]
*164 It would thus appear, by the weight of authority and logic, that the distinction between "affirmative" and "negative" covenants is an anachronism which all too often precludes an analysis of the covenant itself in order to determine whether it should be enforced, whether at law as a covenant running with the land or in equity as an equitable servitude enforceable against the original grantee and all successors having notice. See Caullett v. Stanley Stilwell & Sons, Inc., 67 N.J. Super. 111, 116 (App. Div. 1961), where the court used the law and equity analysis in its review of a restrictive covenant. For the position of treating affirmative and negative covenants similarly, see, in addition to authorities heretofore cited, Berger, "A Policy Analysis of Promises Respecting the Use of Land," 55 Minn. L. Rev. 167, 190-193 (1970). See, also, a critical analysis of the Furness v. Sinquett, supra, decision at 15 Rutgers L. Rev. 290 (1961).
The Appellate Division in Caullett, supra, set forth the requirements of a covenant directly restrictive of title to land. Of the primary requirement that it "touch and concern" the subject property, the court stated:
To constitute a real rather than a personal covenant, the promise must exercise direct influence on the occupation, use or enjoyment of the premises. It must be a promise `respecting the use of the land,' that is, `a use of identified land which is not merely casual and which is not merely an incident in the performance of the promise.' 5 Restatement, Property, Scope Note to Part III, pp. 3147-3148 (1944) [67 N.J. Super. at 116]
The meaning of the "touch and concern" requirement is unclear, especially with respect to affirmative covenants, in New Jersey. Although Caullett v. Stanley Stilwell & Sons, Inc., supra, and Brewer v. Marshall and Cheeseman, supra, 19 N.J. Eq. 537 (E. & A.), spoke in terms of the physical use of the land, both cases involved negative covenants (that the grantor reserved the right to build the original building on the premises, and a covenant not to sell *165 marl). In addition, New Jersey seems to distinguish between burden and benefit as they relate to the "touch and concern" requirement. Compare Brewer, supra, and National Union Bank at Dover v. Segur, 39 N.J.L. 173, 186 (Sup. Ct. 1877); and see 5 Powell, Real Property § 678 at 197-199 (1970).
The covenant here under consideration requires individual lot owners to purchase stock in a property owners' association, and make payment of assessments, which ostensibly will be put to use for the development and maintenance of the lake area. Under such a scheme both the burden and benefit of the covenant would be linked to each parcel found subject to the covenant.
As was stated in Neponsit Property Owners' Ass'n v. Emigrant Industrial Sav. Bank, supra:
In order that the burden of maintaining public improvements should rest upon the land benefited by the improvements, the grantor exacted from the grantee of the land with its appurtenant easement or right of enjoyment a covenant that the burden of paying the cost should be inseparably attached to the land which enjoys the benefit. It is plain that any distinction or definition which would exclude such a covenant from the classification of covenants which `touch' or `concern' the land would be based on form and not on substance. [278 N.Y. at 260, 15 N.E.2d at 797]
For other cases enforcing similar covenants, see Harrison-Rye Realty Corp. v. New Rochelle Trust Co., 177 Misc. 776, 31 N.Y.S.2d 1005 (Sup. Ct. 1941); Lawrence Park Realty Co. v. Crichton, 218 App. Div. 374, 218 N.Y.S. 278 (App. Div. 1926); Kennilwood Owners Ass'n v. Jaybro R. & D. Co., 156 Misc. 604, 281 N.Y.S. 541 (Sup. Ct. 1935); Rodruck v. Sand Point Maintenance Comm'n, 48 Wash.2d 565, 295 P.2d 714 (Sup. Ct. 1956) (where the amounts of the individual assessments were governed by a set standard, "according as the area of such tract bears to the entire area of the tracts assessed, that is, on the square footage basis, and without reference to the value of the *166 front footage thereof; * * *"); Maher v. Cleveland Union Stockyards Co., 55 Ohio App. 412, 9 N.E.2d 995 (Ct. App. 1936).
Examining the covenant therein under consideration, the court in Caullett v. Stanley Stilwell & Sons, Inc., supra, 67 N.J. Super at 118, stated that prerequisite to a conclusion that a covenant runs with the land at law is a finding that both burdened and benefited properties exist and were intended to be so affected by the contracting parties. That the properties were intended to be so affected in the present case appears evident by the incorporation of Beekmere with its ostensible purpose of subdivision development, together with the pattern of original conveyances by the grantor annexing the restrictions to all deeds. As to the existence of burdened and benefited properties, it would seem that both are merged into the individual lots of Allison Acres subject to the covenant, since they reap the benefits of lake area development and provide the source for necessary funds.
Although not discussed in Caullett v. Stanley Stilwell & Sons, Inc., supra, there perhaps is an additional requirement in order for a covenant to run at law, namely, privity of estate. Early cases in this State seems to require a tenurial relationship in order to constitute privity. See Costigan v. Pennsylvania R.R. Co., 54 N.J.L. 233 (Sup. Ct. 1892) (negative duty held unenforceable in the absence of a landlord-tenant relationship); The Inhabitants of City of Bordentown v. Anderson, 81 N.J.L. 434 (E. & A. 1910), writ of error dism., 223 U.S. 714, 37 S.Ct. 521, 56 L.Ed. 626 (1911) (burden of a covenant will not run with the land in the abesnce of lessor-lessee relationship). For a contrary view, see Clark, Real Covenants and Other Interests Which "Run With the Land" (2d ed. 1947), 111-137, which takes the position that logically and historically the only privity requirement is that between the promisor and the assignee which is satisfied by a succession to the estate of the promisor. While the covenant herein under consideration might perhaps fail at least as to the privity requirement, such is *167 not a problem when the covenant is sought to be enforced in equity under a theory of equitable servitude.
The English doctrine of equitable servitudes was based on notice. In that country (which had no recording system) notice had to mean principally actual notice. In this country which has had a well-developed recording system since its beginning, the record was deemed to be notice to the subsequent purchaser, and thus so long as the agreement was recorded, it was a stable and sure way to bind subsequent parties to private use arrangements. [Berger, A Policy Analysis of Promises Respecting the Use of Land, supra, 55 Minn. L. Rev. at 186 (1970)]
As to the privity requirement it has been stated that "Problems as to the existence of `privity' have no significance when * * * [t]he controversy is in equity for the enforcement against a successor of the promisor of a promise with notice of which the ownership has been acquired * * *." 5 Powell, Real Property, § 674 at 171, citing Restatement, Property, § 539, comment (a) (1944). Likewise, our courts have "consistently enforced the covenantal rights of an owner of benefited property against a successor, with notice, to the burdened land, even though the covenant did not run with the land at law." Caullett v. Stanley Stilwell & Sons, Inc., supra, 67 N.J. Super. at 118; Cotton v. Cresse, 80 N.J. Eq. 540 (E. & A. 1912).
Thus, although the question whether an affirmative covenant is enforceable at law as a covenant running with the land is here expressly left open, it is the conclusion of this court that such a covenant is, in equity, enforceable as an equitable servitude against a subsequent grantee who takes with notice. That the covenant was not annexed to all of plaintiffs' deeds is of no consequence since they acquired title with notice of the covenant, its presence in their chain of title charging them with such notice. Olson v. Jantausch, 44 N.J. Super. 380, 388 (App. Div. 1957).
The right to urge enforcement of a servitude against the burdened land "`depends primarily on the covenant's having been made for the benefit' of other land, either retained *168 by the grantor or part of a perceptible neighborhood scheme." Caullett v. Stanley Stilwell & Sons, Inc., supra, 67 N.J. Super. at 119. Since Glendale Investments Inc. has conveyed all the lots in Sections One through Four of Allison Acres, and is likewise conveying out the lots of Section Five, equitable enforcement of the covenant herein under consideration is predicated on the finding of such a scheme.
As set forth in Olson v. Jantausch, 44 N.J. Super. 380, 386 (App. Div. 1957), there must be a clear intent to establish a neighborhood scheme of restrictions. To be effective and enforceable, such a scheme must be (a) universal, the restrictions applying to all lots of like character brought within the scheme; (b) reciprocal, the restrictions constituting a benefit to all lots involved which are subject to the burden imposed, and (c) reasonably uniform as to the restrictions imposed; they need not be identical but any variations must be such as not to create an inequitable burden or benefit. Auerbacher v. Smith, 22 N.J. Super. 568, 573 (App. Div. 1952), certif. den. 11 N.J. 498 (1953); Weinstein v. Swartz, 3 N.J. 80, 86 (1949); Scull v. Eilenberg, 94 N.J. Eq. 759, 771 (E. & A. 1923). Neighborhood schemes are the product of covenant:
* * * They arise when there is a general plan made public by the owner of the tract for the development of his property, `to be secured by a covenant embodying the restriction, to be inserted in each deed to a purchaser; and it appears, by writings or by the circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject to and to have the benefit thereof; and the covenants are actually inserted in all deeds for lots sold in pursuance of the plan * * *.' De Gray v. Monmouth Beach Club House Co., 50 N.J. Eq. 329, 340 (Ch. 1892), affirmed 67 N.J. Eq. 731 (E. & A. 1904). [Anders v. Greenlands Corp., 31 N.J. Super. 329, 342 (Ch. Div. 1954)]
Plaintiffs contend that no neighborhood scheme exists or, alternatively, that the common grantor has abandoned it if one is found to exist. The evidence supports the conclusion *169 that it was the intent of the common grantor, Glendale Investments Inc., to create an integrally related lake community as to all sections of Allison Acres. The tax map reveals that portions of Sections One, Two, Three and Five actually border on the lake and a part of Section Four is adjacent to the lake. In any event, the property furtherest removed from the lake in Section Four is no further from the lake than its counterpart in Section Five. Easements over the two lake access lots in Section Five were reserved by the grantor and were to be used by the property owners for access to the lake on its easterly bank; a similar arrangement was created on the westerly bank where Beekmere retained the only unsold access lot. (It should be noted that in a separate action Beekmere has been ordered by judgment entered October 13, 1970 by another court to release its easements in Section Five except for the limited purpose of maintaining the lake.) The sheet of restrictions annexed to some of plaintiffs' deeds refers to Allison Acres, designating the sections thereof. Finally, Glendale has conveyed a number of lots in Section Five subject to the restrictions, these appearing in a document entitled "Covenants for the Insertion in Deeds `Allison Acres', Sections 1, 2, 3 & 4 and 5."
However, it is stipulated and appears from a report of title examination before the court that not all lots sold by Glendale have been made subject to the covenant under consideration. The question then becomes whether this action by Glendale destroys the neighborhood scheme.
A neighborhood scheme may be created in a number of ways. * * * `The most complete way, of course, is by a reciprocal covenant, whereby the grantor covenants to insert, in apt language, like covenants in all deeds of his remaining lots or lands for the common benefit of all of his grantees and their assigns. Another way is for him to offer his lots for sale, and to sell them, on the representation that all lots will be conveyed subject to like covenants for the common benefit, in which case purchasers with notice or knowledge will be bound by the covenant. But, in the absence of either of these methods (as was the case here), the courts will only spell out such a scheme from a plan of lots and sales therefrom where all the deeds from the common grantor for the lots making up any particular neighborhood *170 group of common benefit therefrom, are made subject to the common covenant. If, under these circumstances, the covenant is omitted from a deed of one lot so located that a violation on that lot of the provisions of the covenant would deprive the other lots of the benefit to be derived by them from the common observance of the restriction, there is, in the absence of knowledge or notice of the scheme on the part of the grantee in the deed for such omitted lot, a failure to make out a neighborhood scheme, at least as to that lot and as to such other lots as would lose the benefit of the scheme if it were violated on the lot not subjected to the covenant.' [Margate Park Protective Ass'n v. Abate, 22 N.J. Super. 550, 554-555 (Ch. Div. 1952), quoting from Scull v. Eilenberg, 94 N.J. Eq. 759, 771 (E. & A. 1923)]
According to Weinstein v. Swartz, 3 N.J. 80, 85-6 (1949):
It is not necessary that all lots in an entire area be made subject to restrictions in order to constitute a neighborhood scheme. The absence of restrictive covenants by the common grantor in some of the properties conveyed by him may be evidence of an intent not to create a neighborhood plan but this evidence is not conclusive. There are other factors which must be considered. As stated in Humphreys v. Ibach, 110 N.J. Eq. 647, 652 (E. & A. 1932), whether such a plan has been established `is a question of fact to be answered, not only by the wording of the deeds, but by the surrounding circumstances and the acts of the parties'. McComb v. Hanly, 128 N.J. Eq. 316 (Ch. 1940), reversed on other grounds 132 N.J. Eq. 182 (E. & A. 1942).
A restrictive covenant is a contract. Rankin v. Brown, 142 N.J.E. 180 (Ch. 1948). Any neighborhood scheme that flows from the terms thereof must be effective and enforceable apply to all lots of a like character brought within the scheme. The consideration to each lot owner for the imposition of the restriction is that the same restrictions are placed upon the lots of others similarly located.
* * * It suffices if all the deeds for the lots making up any particular neighborhood group are made subject to uniform covenants in order that the benefits and burdens of the lots encompassed by the general scheme are subject to mutual burdens and benefits. Sanford v. Keer [80 N.J. Eq. 240], supra; Scull v. Eilenberg [94 N.J. Eq. 759], supra; Humphreys v. Ibach [110 N.J. Eq.], supra, p. 653 [at 85-86]
Finally, it was stated in Margate Park Protective Ass'n v. Abate, 22 N.J. Super. 550, 558 (Ch. Div. 1952), that in order to prove an abandonment or modification of a neighborhood scheme, the materiality of the violations alleged is *171 to be determined by the circumstances of each case, and the question to be resolved is whether the violations are such as to indicate an abandonment of the original general plan and to make its enforcement inequitable because of the changed conditions of the property, citing inter alia, La Fetra v. Beveridge, 124 N.J. Eq. 24 (E. & A. 1938), and Pancho Realty, &c. v. Hoboken Land, &c., Co., 132 N.J. Eq. 15 (E. & A. 1942).
The "neighborhood scheme" in Section Five of Allison Acres must fail due to the inconsistency of making only some similarly situated lots subject to the covenant. Further, since each section is an integral part of the entire lake community subdivision, the entire scheme must fail. It would be inequitable to enforce the burden of the covenant against only those lot owners who were unfortunate enough either to have had their predecessors in title or themselves purchase lots with the restrictions annexed to their deeds. The benefit of maintaining the lake, and indeed developing it further, accrues to all property owners throughout the subdivision. When some owners are released by the common grantor from sharing in the expense attached thereto, the other property owners are forced to tender larger proportionate amounts albeit such noncontributing neighbors will derive at least some if not all of the benefits of a well maintained lake. See also Houston Petroleum Co. v. Automotive Products Credit Ass'n, 9 N.J. 122 (1952) (covenant held unenforceable, one portion of a tract having been released from the restrictions of similarly situated portions of the tract).
Assuming arguendo that a neighborhood scheme were sustainable, the covenant herein would still be unenforceable due to its vagueness of terms and consequent restraint on alienation. Other jurisdictions have held that covenants similar to the one at hand have been enforced; however, their terms were far more precise. See Lawrence Park Realty Co. v. Chrichton, supra, 218 App. Div. 374, 218 N.Y.S. 278 (covenant which required payment of maintenance *172 costs for roads, walks, etc., held enforceable where the covenant set forth a formula for assessment, a maximum charge and a termination date); Kennilwood Owners Ass'n v. Jaybro R. & D. Co., supra, 156 Misc. 604, 281 N.Y.S. 541 (covenant for payment of maintenance costs upheld where maximum amount was specified, and the proceeds were required to be so applied)  in both of which cases large expenditures had already been incurred unlike the case under consideration herein; Nassau County v. Kensington Ass'n, 21 N.Y.S.2d 208 (Sup. Ct. 1940), which involved a covenant to pay a stipulated sum annually to a property owners' association organized for the common welfare of its members. The court noted that the association was not committed by the terms of the covenant to use the funds collected for any particular purpose, or in fact to spend the money at all. Speaking about the "touch or concern" requirement, the court stated that it:
* * * may not be distorted into an optional arrangement leaving the survient contributors of the funds to the mercy of the collecting dominant agency. If a covenant that levies an assessment is to uncloak its apparent personal nature and run with the land, that covenant itself should provide that the land burdened by the payments should be benefited when money collected from the servient lot owners is expended. The agreement at bar merely provides for the payment of dues in sort of a property owners' association. Such an arrangement is without the importance or dignity of a real covenant. [at 215]
See also Neponsit Property Owners' Ass'n v. Emigrant Industrial Sav. Bank, supra, 278 N.Y. 248, 15 N.E.2d 793 (convenant specified that the funds collected would be devoted to maintenance purposes), and Rodruck v. Sand Point Maintenance Comm'n, supra, 48 Wash.2d 565, 295 P.2d 714 in which the court read the articles of incorporation, by-laws and deeds together and sustained a covenant under which the corporation would make improvements and maintain strips and parking areas, and would assess owners in the manner set forth in the by-laws. Again there was a specified standard for assessment, and the money was required *173 to be spent on the designated purpose. (In addition, unlike the case before this court, purchasers became members of the nonprofit corporation and received a share of stock without the payment of an additional fee.)
Although the precise facts are not apposite to the present case, Mountain Springs Ass'n of New Jersey v. Wilson, 81 N.J. Super. 564 (Ch. Div. 1963), sets forth the general rule with regard to vagueness of terms in covenants restrictive of title:
It is also firmly established that the policy of the law is against the imposition of restrictions upon the use and enjoyment of land, and that such restrictions are to be strictly construed. The foundation of this policy is that while restrictions tend to protect property, they also impair alienability. Hammett v. Rosensohn, 46 N.J. Super. 527, 535 (App. Div. 1957), affirmed 26 N.J. 415 (1958); Bruno v. Hanna, 63 N.J. Super. 282, 285 (App. Div. 1960). Furthermore, ambiguities and uncertainties are resolved in favor of the owner's unrestricted use of his land. [at 575]
(The court relied in part on Wayne Lakes Park v. Warner, 104 Ohio App. 167, 147 N.E.2d 269 (Ct. App. 1957), in which injunctive relief was denied to a grantor where the deed contained a provision that the grantee shall at all times maintain annual membership in a property owners' association operated by the grantor.) Thus, if the covenant is vague or ambiguous, it should not be construed to impair the alienability of the subject property. See Caullett v. Stanley Stilwell & Sons, Inc., supra at 67 N.J. Super. 115, which involved a covenant by which the grantor reserved the right to construct the original building on the premises, and the cases cited therein. It should also be noted that in Mountain Springs Ass'n of New Jersey v. Wilson, supra, the argument was advanced that a covenant restricting the sale of property to members of the association implied that all purchasers of property in the Mountain Springs area must become members of the association. After stating that the express covenant was void and unenforceable *174 because it restricted the alienation of land, the court stated that the implication advanced would likewise restrict alienation for the reasons pertaining to the express covenant.
In the covenant before this court there is no formula by which to calculate future assessments, thus binding property owners to unspecified obligations and leaving open the possibility of inequitable assessments as to each member of the lake community. See Moorestown Mgmt. v. Moorestown Bookshop, 104 N.J. Super. 250 (Ch. Div. 1969), in which a provision in a shopping center lease requiring tenants to become members of an incorporated association of all tenants, to pay dues and to be bound by the by-laws of the association, was not found invalid where the by-laws, which were incorporated by reference into the lease, provided a formula for establishing dues. Cf. Syrian Antiochian Orthodox Archdiocese of N.Y. v. Palisades Ass'n, 110 N.J. Super. 34 (Ch. Div. 1970) (covenant preventing erection of structures unless plans were approved by grantor, held valid despite lack of objective standards). Nor is there any limitation on the duration of the covenant in question, unlike covenants upheld in decisions in other jurisdictions. See also Mountain Springs Ass'n of New Jersey v. Wilson, supra, in which a covenant restricting the alienation of land except to members of a property owners' association so long as the association was in existence was held void, partially on the grounds that it was unlimited in duration.
Beekmere, Inc., according to its certificate of incorporation, has perpetual existence. Further, there is no requirement that the assessment money must be spent on the land from which the funds were received. In Glendale's conveyances to Beekmere, the latter was not bound to the restrictions which attached to the individual property owners; the covenant itself does not require that the money must be expended for the development of Allison Acres, nor is there anything in Beekmere's certificate of incorporation or by-laws that requires the funds to be so expended. Indeed, *175 Beekmere is not restricted to dealing solely with the subdivision known as Allison Acres. Finally, property owners are required to purchase a nontransferable share of stock in a corporation for profit. When they leave Allison Acres they cannot recover their capital investment nor transfer the stock to a new purchaser as part of the consideration. Having paid $100, they have no further interest or rights in the stock if they leave Allison Acres.
These ambiguities, uncertainties and shortcomings likewise militate against the enforcement of this covenant in equity.